TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00644-CV






Cliff Gustafson, Appellant



v.



DeLoss Dodds, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT


NO. 99-08507, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING






 Cliff Gustafson elected to resign rather than be terminated from his position as head
baseball coach at the University of Texas at Austin (the University). Gustafson responded by
suing the Director of the Men's Athletic Department, DeLoss Dodds, in his individual capacity
for fraud and infliction of emotional distress. The trial court granted summary judgment in favor
of Dodds on the ground of official immunity. We hold that Dodds has made a prima facie
showing that he is entitled to official immunity. Because Gustafson has not raised a question of
fact as to Dodds's immunity, we affirm the trial court's judgment.


FACTS


 Gustafson resigned from his position as head baseball coach in July 1996. The
resignation, which ended a noteworthy career and many years of service to the University, (1)
centered around Gustafson's summer baseball camp. From 1968 to 1996, Gustafson operated a
summer youth baseball camp that utilized facilities both on and off the University campus. Dodds
became aware of concerns regarding the camp in 1996. According to Dodds, the specific concern
was whether payments to Deron Gustafson, Gustafson's son, who served the University as a
volunteer coach, violated National Collegiate Athletic Association (NCAA) rules that prohibited
the University from paying volunteer coaches with sports camp income.

 Dodds testified in his affidavit that he learned after questioning members of his staff
that Gustafson had established a "non-University bank account wherein income from baseball
summer camps had been deposited and payments had been made to Deron Gustafson and others." 
According to Dodds, both University and the Board of Regents' rules prohibit coaches from
maintaining such accounts. Dodds informed University Vice President Ed Sharpe of his findings
and Sharpe requested that the University's Office of Internal Audits investigate the camp's
finances. That office performed an audit of the summer baseball camp for the years 1991 through
1996 and prepared an extensive report on July 17, 1996.

 The audit "included reviewing all relevant University records and other
documentation related to the summer baseball camp program and interviewing summer baseball
camp coaches and administrative staff and other Athletics Department personnel." The report
explained that Gustafson had deposited revenues from the summer camp in an outside bank
account in violation of University rules. One rule states that "money received by all departments
from all sources shall be deposited, using an official form, in the institutional business office,
unless depositing directly to a special bank account has been specifically authorized." According
to the report, the rule specifically addresses off-campus activities and reflects the University's
policy, consistent with that of the NCAA, that "programs under the sponsorship of the University
should be under the financial and operational control of the University in the same way that other
academic, research, auxiliary and administrative activities are controlled by the University."

 Gustafson contends that he established the outside bank account because it avoided
bureaucratic delays, not because he wished to circumvent University rules. He explained in his
affidavit that although he initially created an account for the baseball camp with the University
business office, he began using an outside account when the camp's growth necessitated that the
funds be accessible without delays, and after the business office had allegedly lost twenty thousand
dollars of the camp's money which was never recovered. Gustafson maintains that the net
revenues from the various University sports camps had always been distributed to the coaches in
charge of the camps, and the use of a non-University bank account did not change this distribution
scheme. He argues that since he owned the camp (2) he believed that the baseball camp money was
his money to manage as he saw fit. The University states a different view in the audit report:
"[T]he creation of a separate account violated University regulations, made it impossible for the
University to fulfill its income tax withholding, accounting and reporting obligations and may
have resulted in NCAA violations." The report included several recommendations, including that
the University Athletics Department discuss the findings with the NCAA's Infractions Division.

 After learning of the audit report's conclusions, then-President of the University
Robert Berdahl met with Gustafson and his attorneys. Dodds, Vice President Sharpe, and Patricia
Ohlendorf, who is Counsel to the President, also attended the meeting. Dodds contends that the
purpose of the meeting was to give Gustafson an opportunity to respond to the audit report, and
that the investigation and audit report were the focal points of the meeting. Gustafson alleges that
a different document, a Coaches Outside Income Agreement for the 1995-96 academic year,
played a significant role at the meeting.

 NCAA regulations require each coach to report at the start of the academic year
the estimated amounts of all athletics-related income that the coach expects to receive from outside
sources during the year. Gustafson alleges that during the meeting, President Berdahl showed
Gustafson his signed form, which listed no outside income; Berdahl then accused Gustafson of
having committed an NCAA violation by listing no outside income. Gustafson claims that the
blank form caused him to think that he had in fact committed a violation by failing to list his
outside income as required and led to his subsequent resignation. Dodds, in his affidavit, had no
recollection of President Berdahl presenting the outside income form to Gustafson at the meeting.

 Dodds explained that based on the investigation and the audit report, he
recommended to Berdahl that Gustafson be removed from his position as head baseball coach. 
The University gave Gustafson the option to resign in lieu of termination based on the alleged
violations. Gustafson states that the "documentary evidence" of the blank outside income form
was "undeniable," and it appeared to him at the meeting that he had violated NCAA rules, leaving
him with no alternative but to resign.

 Gustafson claims that about a year after the meeting, he discovered that the original
outside income form for the 1995-96 year that he had properly filled out and signed had been
altered with white-out to eliminate the estimated income that he had listed. Dodds stated in his
affidavit that Leroy Sutherland, who is the University Athletics Department Compliance
Coordinator, used white-out to erase amounts erroneously listed as outside income to ensure that
the form complied with applicable NCAA regulations. There is evidence in the record that
Sutherland had similarly altered other coaches' forms when amounts that were in fact University
income were mistakenly listed as outside income. Dodds also stated that he relies on Sutherland
to ensure that the forms are correct and that he had a good-faith belief that Gustafson's altered
1995-96 outside income agreement form was correct.

 Gustafson sued Dodds in his individual capacity for fraud and intentional infliction
of emotional distress. Specifically, Gustafson alleges that Dodds committed fraud and conspiracy
to defraud him by conspiring with University staff to falsify the outside income agreement and
submitting the falsified form to Berdahl to make the University President think that Gustafson had
failed to report his outside income. Gustafson contends that Dodds conspired with Berdahl to
conceal the fraud (the whited-out document) by showing Gustafson a copy of the form at the
meeting in a manner that the white-out alteration could not be discovered by Gustafson. He also
alleges that Dodds misrepresented to Berdahl that the outside bank account violated University
rules and that money given to Deron Gustafson violated NCAA rules. Dodds filed a motion for
summary judgment based on the affirmative defense of official immunity, (3) which the trial court
granted. Gustafson appeals from that order.


STANDARD OF REVIEW

 The standards for reviewing a motion for summary judgment are well established:
(1) the movant for summary judgment has the burden of showing that no genuine issue of material
fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is
a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant
will be taken as true; and (3) every reasonable inference must be indulged in favor of the
nonmovant and any doubts resolved in its favor. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d
546, 548-49 (Tex. 1985). When a defendant moves for summary judgment on the basis of an
affirmative defense, the defendant must present and prove each essential element of the affirmative
defense. AmWest Sav. Ass'n v. Shatto, 905 S.W.2d 400, 403 (Tex. App.-Austin 1995, writ
denied). A defendant may prevail on summary judgment in pleading an affirmative defense by
conclusively proving all the elements of his affirmative defense. Id.


DISCUSSION

 The single issue before us is whether the order granting summary judgment in favor
of Dodds based on official immunity is correct. Government employees are entitled to official
immunity when sued in their individual capacity for official acts. Medina County Comm'rs' Court
v. Integrity Group, Inc., 944 S.W.2d 6, 9 (Tex. App.-San Antonio 1996, no writ). Government
employees are entitled to official immunity from suit arising from the performance of their (1)
discretionary duties (2) in good faith (3) as long as they are acting within the scope of their
authority. City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994).

 Gustafson did not contest at the trial stage nor on appeal that Dodds's duties are
discretionary. Personnel decisions are necessarily discretionary. See Dalrymple v. Univ. of Tex.
Sys., 949 S.W.2d 395, 400 n.2 (Tex. App.-Austin 1997) (noting that compilation of annual tenure
evaluations of university professors was discretionary because it involved personal deliberation,
decision, and judgment), rev'd in part, Brewerton v. Dalrymple, 997 S.W.2d 212 (Tex. 1999). (4) 
Dodds produced evidence that his recommendation to Berdahl that Gustafson be removed was a
discretionary act based on the investigation, audit, and Dodds's considerable experience as an
athletics director. Gustafson produced no controverting evidence. Because the evidence
establishes that Dodds acted pursuant to discretionary duties, we next consider whether Dodds
acted in good faith and within the scope of his authority.


I. Official Immunity

 A. Good Faith

 The Texas "good faith" standard is derived from the federal standard, which is a
test of objective legal reasonableness. Id. at 400. A summary-judgment movant can satisfy the
good-faith requirement of official immunity by showing that a reasonably prudent official, under
the same or similar circumstances, could have believed that the action complained of was
warranted. Id. The good-faith element of the test is designed to ensure that officials who act in
good faith, even negligently, are protected. Id.

 To demonstrate that he acted in good faith, Dodds explains in his affidavit that at
the time of the meeting with Berdahl, the University had completed an audit that disclosed
potential violations by Gustafson of University and NCAA rules and regulations. Gustafson first
asserts that the trial court erred in denying his objections and special exceptions to Dodds's
affidavit and to the motion for summary judgment. Gustafson next complains that he created a
fact issue regarding whether Dodds acted in good faith. We will first address whether the court
erred in denying the special exceptions.

 The trial court has broad discretion in ruling on special exceptions. See Slentz v.
Am. Airlines, Inc., 817 S.W.2d 366, 368 (Tex. App.-Austin 1991, writ denied). Gustafson
contends that the trial court abused its discretion by denying his special exceptions because neither
the affidavit nor the motion identified any specific rules or regulations that Gustafson had violated. 
Dodds, however, attached a copy of the audit report as an exhibit to the motion and to Dodds's
affidavit, which was also an exhibit to the summary-judgment motion. The audit report identified
specific rules and regulations that Gustafson had violated. Moreover, the only issue before us is
whether Dodds is entitled to official immunity. Thus, whether Dodds conclusively shows that
Gustafson violated specific rules and regulations is irrelevant to the inquiry whether Dodds acted
in good faith in believing there were violations and in recommending that Gustafson be removed
as baseball coach.

 We also reject Gustafson's argument that the trial court abused its discretion
because Dodds's affidavit contains mere conclusions that Gustafson had violated University and
NCAA rules and regulations. Dodds's affidavit demonstrates that he based his recommendation
that Gustafson not continue as head coach on the findings of the audit. In the affidavit, Dodds
described the events leading up to the investigation by the Office of Internal Audits and the
findings of the audit. He stated that "[a]ll of the aforementioned violations are a very serious
matter for the University and are a legitimate basis for termination." We hold, therefore, that the
trial court's denial of Gustafson's special exceptions was within its discretion.

 We next address whether Dodds satisfied the good-faith requirement by showing
that a reasonably prudent athletic director, under the same circumstances, could have believed that
his actions concerning Gustafson were warranted. See Dalrymple, 949 S.W.2d at 400. Dodds's
affidavit states that his actions were taken in reliance on the audit and investigation. Rule 166a(f)
of the Texas Rules of Civil Procedure governs summary-judgment affidavits. Tex. R. Civ. P.
166a(f). Subsection (f) of rule 166a states: "Supporting and opposing affidavits shall be made on
personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show
affirmatively that the affiant is competent to testify to the matters stated therein." Id. Summary
judgment may rest solely on the testimonial evidence of an interested witness if that evidence is
uncontroverted, clear, positive, credible, free from contradictions and inconsistencies, and could
have been readily controverted. Watkins v. Hammerman & Gainer, 814 S.W.2d 867, 869-90
(Tex. App.-Austin 1991, no writ).

 Dodds asserts that a reasonably prudent athletics director in the same circumstances
could have believed that Gustafson should be removed as baseball coach. Dodds maintains that
he reasonably based his decision on the investigation into the baseball camp and the audit of the
camp, which had disclosed violations of University rules and potential violations of federal law
and NCAA regulations. Specifically, Gustafson's use of a non-University bank account conflicted
with the rule that all money received by members of University departments be deposited in the
institutional business office unless the member had received specific authorization to use a
different account. A memo emphasizing the rule had been given to all Athletic Department staff,
including Gustafson, in 1989. The Department of Men's Athletics did not know the extent to
which Gustafson used the outside bank account until the audit revealed that approximately
$284,900 of camp-related revenues had been deposited in the account from 1992 to 1996.

 The report indicated that certain expenditures from the outside account represented
potential violations of federal law, University policy, and NCAA regulations. First, expenditures
from the account for compensation to people for camp-related work were apparently not reported
to the IRS as compensation in accordance with applicable federal law, nor was money withheld
for taxes. Second, disbursements from the account to Deron Gustafson represented violations of
NCAA regulations. When the University initially appointed Deron as a volunteer assistant
baseball coach, NCAA rules did not prohibit payment to him from the summer baseball camp
program. As a result of changes to NCAA rules in 1993, the University appointed Deron as a
Restricted-Earnings Coach, who under the rules, could earn no more than $4000 a year. In 1995,
Deron became an unpaid volunteer coach with no compensation or remuneration from the
University. The audit reported direct disbursements to Deron from the outside account in the
amount of $61,850; and an additional $45,349.25 in indirect payments may have been made to
Deron. Additional payments to Deron in the amounts of $1650 in 1993, $26,700 in 1994, and
$27,050 in 1995 also may have represented violations of NCAA regulations.

 These facts are relevant because "'[w]e look to whether a reasonable official could
have believed his or her conduct to be lawful in light of clearly established law and the
information possessed by the official at the time the conduct occurred.'" Chambers, 883 S.W.2d
at 656 (citation omitted). Dodds's affidavit establishes that his recommendation to Berdahl against
retaining Gustafson was based on "the investigation, the official audit report, the facts as I
understood them at that time, and my best judgment of the interests to be served and protected,
including the University's interest in ensuring that Athletics Department staff comply with
applicable rules and regulations." Dodds explained that he had based similar decisions regarding
other personnel on investigations and audit reports, specifically in 1992. Dodds also noted that
he had been working to renew Gustafson's contract with the University before the investigation.

 The supreme court explained that the "could have believed" aspect of the good-faith
test means that in order to be entitled to summary judgment, the movant must prove that a
reasonably prudent athletics director might have believed that Gustafson should be removed as
head baseball coach. See id. at 656-57. It does not mean that an athletics director has to prove
that it would have been unreasonable to recommend that Gustafson not be removed as head
baseball coach; nor must the athletics director prove that all reasonably prudent athletics directors
would have recommended that Gustafson be removed from his position. See id. at 657. We
conclude that Dodds has produced evidence showing that a reasonably prudent athletics director
in the same circumstances might have believed that he or she should recommend against retaining
Gustafson. 

 Because Dodds, as movant, supplied proof of his defense, we must look to
Gustafson's response to determine if it raised a material fact issue. See O'Bryant v. City of
Midland, 949 S.W.2d 406, 412 (Tex. App.-Austin 1997, no writ). To controvert the official's
summary-judgment proof on good faith, the plaintiff must show that "no reasonable person in the
defendant's position could have thought the facts were such that they justified defendant's acts." 
Chambers, 883 S.W.2d at 657 (citation omitted). In applying this test we must decide whether
Dodds's actions were objectively, rather than subjectively, reasonable. See Dalrymple, 949
S.W.2d at 401. Although this presents an elevated standard of proof for the movant to satisfy,
the burden is not impossible for the nonmovant to meet. Id. at 402. We begin by viewing the
summary-judgment proof in the light most favorable to the nonmovant. Id. Thus, in summary-judgment proceedings in which the parties disagree about the reasons underlying an official's
action, the court must take the nonmovant's responsive allegations as true and evaluate the
evidence supporting those allegations. Id.

 Gustafson argues that, as in Dalrymple, the parties to the instant case disagree about
the underlying reasons for Dodds's actions. Gustafson contends that Dodds provided Berdahl an
inaccurate outside income form, and misinformation that Gustafson had violated University and
NCAA rules and regulations, so that Gustafson appeared unprofessional and was forced to resign. 
Gustafson, to raise a fact issue, must produce some evidence that his allegations are true. See id. 
We consider, then, whether Gustafson produced some evidence that (1) Dodds provided Berdahl
an inaccurate outside income form, and misinformation that Gustafson violated applicable rules
and regulations by maintaining a non-University bank account, with the intent of forcing
Gustafson to resign; and (2) that no reasonable athletics director would have thought that
deliberately providing misinformation was justified. See id.

 None of Gustafson's evidence supports his contention that Dodds deliberately
misinformed the University president that Gustafson had violated University rules. In his
response to Dodds's motion for summary judgment, Gustafson attached as exhibits the original,
and the altered, outside income forms. Gustafson argued that the fact that the form had been
altered constituted evidence of Dodds's lack of good faith. While Gustafson has proven that the
form was altered, he has not controverted Dodds's evidence, which established that such
alterations were routine and made to make the forms more, not less, accurate. In addition, the
fact that the form had been altered does not controvert Dodds's affidavit testimony that, assuming
the form was discussed at the meeting, Dodds had a "good-faith belief, based on the information
available to [him] at that time and exercising [his] discretion and best judgment, that the form was
accurate."

 Gustafson also produced portions of Dodds's deposition testimony in which,
according to Gustafson, Dodds failed to respond to Gustafson's request that Dodds name the
particular rules of the University that had been violated. Gustafson contends that Dodds's failure
to identify with specificity the rules that Gustafson allegedly violated proves that Dodds knew at
the time of Gustafson's resignation that there were no rules governing the baseball camp. (5) First,
Gustafson misstates the nature of the deposition testimony. In the attached portion of Dodds's
deposition, Dodds responded to Gustafson's question by specifically identifying the 1989 memo
to the Athletics Department staff explaining that all money received by members of University
departments had to be deposited in the institutional business office. Dodds also responded by
citing a specific NCAA rule. Second, Gustafson's proof does not controvert Dodds's evidence
that Dodds based his belief that the outside bank account was a violation of University rules on
the findings of the audit report.

 Gustafson also offered as evidence the minutes of a meeting of the Men's Athletics
Council on September 11, 1996, which the Council approved the University Athletics
Department's recommended camp policy manual. The manual regulates sports camps that are
owned by the University (institutional) or by an employee of the Athletics Department (private). 
Gustafson argues that the 1996 manual represented the University's first attempt to adopt rules
governing private camps, (6) and thus, that no rules existed during Gustafson's tenure that would
have governed the operation of his camp. Assuming this contention is correct, Gustafson has
merely pointed to a dispute that is not before us-the parties' characterization of Gustafson's
camp-rather than proved that Dodds did not reasonably rely on the audit's findings in making his
recommendation.

 Even if we take Gustafson's allegations as true, Gustafson did not produce evidence
that raised a question of fact as to whether Dodds acted in good faith. We hold, therefore, that
Dodds has proved this element of his defense.



 Scope of Authority


 Gustafson argues that Dodds did not act within the scope of his authority because
he provided a falsified outside income agreement form to Berdahl and misinformed the University
president about the propriety of the outside bank account. Gustafson reasons that because Dodds
was not authorized to provide his superior with a falsified document or with misinformation, his
actions are not protected by official immunity. Gustafson claims that "[o]fficial immunity is not
applicable to a claim against a governmental officer or employee in his individual capacity for
damages resulting from the officer or employee's wrongful unofficial act." Gustafson relies in
part on Bagg v. University of Texas Medical Branch, 726 S.W.2d 582 (Tex. App.-Houston [14th
Dist.] 1987, writ ref'd n.r.e.), to support his proposition. (7) 

 In Bagg, a former employee of the University of Texas Medical Branch at
Galveston (UTMB), sued UTMB and individual employees for both injunctive and monetary relief
after he was told he would be terminated. Bagg's claims against the defendants were dismissed
on summary judgment based on immunity. Id. at 583. The court of appeals held that the trial
court had erred in dismissing Bagg's claims for damages against the individual defendants in their
individual capacities. Id. at 586-87. The court stated that although Bagg's termination occurred
as a result of the defendants' actions in their official capacities, the allegedly wrongful acts that
led to his termination, such as ordering other employees to eavesdrop on Bagg's telephone
conversations, prevented dismissal on immunity grounds. The court held that "[o]fficial immunity
only shields persons from suits complaining of official acts. Persons can still be sued in their
individual capacities for wrongful unofficial acts." Id. at 586.

 The Texas Supreme Court has rejected such reasoning. See Chambers, 883 S.W.2d
at 658. In Chambers, the parents of a man who was seriously injured during a high-speed chase
with police sued four police officers who were involved in the pursuit. Chambers was riding on
the back of a motorcycle driven by Scott Stiles when one of the police officers, who allegedly saw
Stiles run a red light, began pursuing him. Ultimately, ten police vehicles joined the pursuit,
which exceeded speeds of eighty to one-hundred miles per hour. When Stiles attempted to exit
the interstate, the motorcycle crashed at a high rate of speed into a sign pole, killing Stiles and
seriously injuring Chambers.

 Chambers sued the defendants for common-law negligence and deprivation of rights
under a federal civil rights statute. The supreme court disagreed with the appellate court's
implication that because the officers had no authority to drive without due regard for the safety
of others, they were not acting within the scope of their authority. (8) Id. As the court made clear,
we focus not on whether an official has the authority to do an allegedly wrongful act, but on
whether the official is performing the duties generally assigned to him when the act occurs. (9) Id. 
The court held that the defendant officers were acting within the scope of their authority because
each officer was on duty, in a squad car, pursuing a suspect. Id. Framing the inquiry as
Gustafson would have us do-that an official does not have the authority to commit a wrongful
act-unduly restricts the scope and purpose of the official immunity doctrine, which is to protect
public officers from civil liability for conduct that would otherwise be actionable. See id. at 653-54.


If official immunity existed only in the cramped sense used by the court of appeals,
its qualified promise against personal civil liability to public officers would be
hollow indeed. The purpose of the doctrine of official immunity is to protect
public officers from civil liability for conduct that would otherwise be actionable.



Id.

 The summary-judgment evidence indicates that Gustafson's claims center around
actions that Dodds took in his role as athletics director. Gustafson argues that Dodds gave
Berdahl an altered and inaccurate outside income form that led Berdahl to believe that Gustafson
had failed to report outside income as required by the NCAA. Gustafson also argues that Dodds
misinformed Berdahl that Gustafson had violated NCAA regulations by maintaining an outside
bank account and by giving money to Deron, because, according to Gustafson, "[t]he record
confirms that no rules or regulations of the Board of Regents, the University, or the NCAA
prohibit[] a coach from maintaining, and using money from, an independent camp."

 The evidence shows that the acts alleged by Gustafson to be outside Dodds's
authority were, in fact, within his authority. In his affidavit, Dodds stated that his duties include
"evaluating Athletics Department staff and making recommendations regarding the hiring and
firing of Athletics Department staff." Dodds also stated that as the Athletics Director, he was
ultimately responsible for overseeing compliance with University and NCAA rules and
regulations. Dodds performed his duties regarding hiring and firing determinations and other
personnel decisions when he recommended that Gustafson be removed. Taking as true
Gustafson's contention that Dodds had given Berdahl the outside income form, and that it was
presented to Gustafson at the meeting in July 1996, Dodds was acting to fulfill his duty to ensure
compliance with applicable rules and regulations, as the purpose of the form was to ensure the
University's compliance with NCAA rules. In addition, Dodds argues that even if he gave the
form to Berdahl at the meeting, he would have been acting appropriately, as the purpose of the
meeting was to allow Gustafson to respond to the audit report that had identified violations of the
very rules that Dodds had the responsibility of ensuring the staff followed.

 We hold that Gustafson has not raised a question of fact regarding the issue of
whether Dodds was acting within the scope of his authority. Even if we accept Gustafson's
allegations that Dodds acted wrongfully, Dodds was performing duties generally assigned to him. 
To hold otherwise would violate the spirit and purpose of official immunity recognized by the
supreme court in Chambers.


II. Withdrawing Deposition Testimony

 Gustafson argued to the trial court in his response to Dodds's motion for summary
judgment, and to this Court, that he should have been allowed to withdraw portions of his
deposition testimony in which he states that he violated rules and regulations of the University and
the NCAA. Gustafson maintains that the trial court erred in denying his request to withdraw the 
testimony because Gustafson's admissions were made erroneously after Dodds and his staff
fraudulently misled Gustafson to believe that the outside bank account violated the rules. While
Gustafson points to the "artful questioning of counsel at [the] deposition" as the cause of his
mistaken admissions, he was represented at the deposition by his attorney. Moreover, Gustafson
was given the opportunity to review his deposition and make any necessary changes. Indeed, he
submitted numerous corrections with the signature page of his deposition that explained that
Gustafson did not knowingly violate the applicable rules or regulations; however, in his
clarification, Gustafson did not withdraw his repeated admissions that he had violated the rules.

 Nonetheless, Gustafson relies on Stelly v. Papania, 927 S.W.2d 620, 621 (Tex.
1996), in which the court considered for the first time whether a party could withdraw a discovery
response and substitute a new response. See id. at 621. Papania sued Stelly after he fell while
delivering a pizza to Stelly in what he believed was Stelly's front yard. Stelly mistakenly stated
in a request for admissions that he owned the premises where Stelly fell; he later moved to
withdraw and amend the admission when a survey revealed that the city in fact owned the
premises. The court in Stelly held that a trial court does not abuse its discretion in allowing a
party to withdraw and amend its original answers to a request for admissions when the party
shows (1) good cause, (2) that the party relying on the responses will not be unduly prejudiced,
and (3) that the withdrawal will serve the purposes of legitimate discovery and the merits of the
case. Id. 

 Gustafson uses the following language from the court's opinion to support his
position that the court erred by denying his request: "The 'ultimate purpose of discovery is to seek
the truth. . . . The discovery rules were not designed as traps for the unwary, nor should we
construe them to prevent a litigant from presenting the truth.'" Id. at 622 (citations omitted). 
Gustafson fails to show, however, that he has good cause for his request to withdraw the
admissions in his deposition testimony; nor has he shown that Dodds will not be unduly
prejudiced, or that the withdrawal will serve the purposes of legitimate discovery and the merits
of the case. See id. at 621. In addition, the instant case is factually distinguishable from Stelly
because Gustafson made not one, but several admissions that he violated the rules. Moreover,
Stelly sought to substitute his mistaken admission that he owned certain property based on the
later-obtained survey that showed he did not own the premises. In contrast, Gustafson sought to
withdraw his deposition testimony based on his own subjective belief, not on objective third-party
information that clarified the facts recited earlier.

 Dodds argues that the trial court did not abuse its discretion in denying Gustafson's
request because whether Gustafson in fact violated applicable rules is irrelevant to whether Dodds
is entitled to immunity. We agree. Dodds further argues that the trial court correctly refused
Gustafson's request under the standard articulated in Mendoza v. Fidelity & Guaranty Insurance
Underwriters, Inc., 606 S.W.2d 692, 694 (Tex. 1980). The issue in Mendoza was whether the
plaintiff's testimony was a judicial admission that conclusively negated an element of his prima
facie case. Id. We need not reach this issue because Gustafson's testimony is irrelevant to the
resolution of the single issue on appeal. The record establishes, without regard to Gustafson's
deposition testimony, that Dodds is entitled to official immunity and that Gustafson failed to raise
a fact question on that issue. An appellate court should set aside the trial court's ruling only if,
after reviewing the entire record, it is clear that the trial court abused its discretion. Stelly, 927
S.W.2d at 622. Our review of the record indicates that the trial court was well within its
discretion in its denial of Gustafson's request.


CONCLUSION

 We hold that Dodds established that he is entitled to official immunity because the
acts that are the subject matter of this lawsuit consisted of discretionary duties that he performed
in good faith that were within the scope of his authority, and that Gustafson failed to raise a fact
issue regarding Dodds's entitlement to official immunity. The trial court acted within its
discretion in denying Gustafson's request to withdraw his deposition testimony regarding rules
violations. We affirm the trial court's summary judgment in favor of Dodds.



 

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: April 12, 2001

Do Not Publish

 
1. Gustafson enjoyed a distinguished record in college baseball history with 1466 wins, 377
losses, and 2 ties.
2. The parties dispute whether the baseball camp was a private or institutional camp. The
resolution of this issue is not relevant to the single issue of this appeal-Dodds's entitlement to
official immunity.
3. The summary-judgment motion at issue in this appeal is the second one filed by Dodds. 
Dodds initially requested that the trial court dismiss the case or grant summary judgment based
in part on the defense of official immunity. The trial court denied the motion and Dodds filed an
interlocutory appeal. Dodds voluntarily dismissed the interlocutory appeal and filed a second
motion for summary judgment based exclusively on the defense of official immunity. 
4. The supreme court did not address the official immunity issue because of its disposition of
other issues.
5. Gustafson bases this contention on his belief that the summer baseball camp was a private,
non-institutional camp, and that the University did not have rules regulating private camps until
after Gustafson resigned. As noted earlier, the parties dispute whether the camp was private or
institutional; we need not resolve the dispute, however, to decide the issue of official immunity
presented in this appeal.
6. For support, Gustafson attached a record of a meeting between the Athletics Department
(including Dodds) and the Office of Internal Audits that took place in July, 1996, that
distinguished private and institutional camps.
7. Gustafson also relies on decisions similar to Bagg, including Guerrero v. Tarrant County
Mortician Services Co., 977 S.W.2d 829, 832 (Tex. App.-Fort Worth 1998, pet. denied) (stating
that "[u]nlawful or unauthorized acts are not considered acts of the State[] and state officials can
be sued in their individual capacities for wrongful unofficial acts"); Bonham v. Flach, 744 S.W.2d
690, 692-93 (Tex. App.-San Antonio 1988, no writ) (stating that "official immunity only shields
persons from suits complaining of official acts [and that] [p]ersons can still be sued in their
individual capacities for wrongful unofficial acts"); Kelly v. Galveston County, 520 S.W.2d 507,
513 (Tex. Civ. App.-Houston [14th Dist.] 1975, no writ) (stating that while public officials
"cannot be held accountable if they had a legal right to do what they did . . . they can be held
personally liable if they have exceeded the legitimate bounds of their office").
8. The court also rejected the appellate court's similar conclusion that because the officers did
not have discretion to drive their vehicles without due regard for the safety of others, their actions
could not be protected by official immunity. City of Lancaster v. Chambers, 883 S.W.2d 650, 653
(Tex. 1994).
9. Gustafson argues that the trial court erred by applying the wrong legal standard to both the
good-faith and within-the-scope-of-authority elements of the immunity defense. In support of this,
Gustafson points to the court's order of final judgment, which recites that Gustafson had not
controverted Dodds's evidence establishing the two elements because he had not shown that Dodds
acted "deliberately or recklessly." We need not address this argument because although the
court's language is not identical to the supreme court's articulation in Chambers, it is similar in
its legal import: Gustafson was required to produce evidence that would raise a question regarding
whether Dodds acted in good faith or within his authority. See id. at 657. Gustafson has failed
to produce any such evidence.



fficial immunity. The trial court acted within its
discretion in denying Gustafson's request to withdraw his deposition testimony regarding rules
violations. We affirm the trial court's summary judgment in favor of Dodds.